OPINION
{¶ 1} Appellant, Anthony M. Scarl, appeals from a jury verdict of the Portage County Court of Common Pleas, finding him guilty of having a weapon while under a disability, a third degree felony, in violation of R.C. 2923.13. For the reasons set forth below, we affirm the judgment of the trial court.
 {¶ 2} The following facts were adduced from testimony and exhibits admitted during the suppression hearing connected with this matter. Appellant and his wife, Carol Scarl ("Mrs. Scarl"), lived in a home in Garrettsville, Portage County, Ohio. A domestic incident ensued on September 9, 2001. Mrs. Scarl went by foot to the Garrettsville Police Department, wearing shorts, a t-shirt, socks, and no shoes. According to the police version of the incident, Mrs. Scarl arrived at 10:53 p.m. and appeared winded, shaking, and crying. She was bleeding through her sock on her right foot and had visible red marks by her right eye, with some swelling and redness about her face.
 {¶ 3} Mrs. Scarl indicated to the police that her husband had assaulted her at their residence. Mrs. Scarl provided a statement to the police at approximately 11:00 p.m. Mrs. Scarl stated, "[w]e were @ home and had been drinking. * * * I went to bed * * *. The next thing I remember is [appellant] yelling at me calling me a whore hiting [sic] me pushing then he hit me in the R side of my face pushed me around the bed. He wrapped his fingers hands around my neck choked me. I was able to pry his fingers off my neck. I put clothes on ran out of the house without shoes. I ran across the neighborhood 
[appellant] was chasing me in the car. He had hit me several times in the face head before I ran out of the house. After I ran out of the house he was chasing me in the car. When he would drive up beside me I would run off between the houses until I made my way across town to the police station. * * * Previously on a different occasion he has made the comment that there would be an `all out shoot out' if the police ever came to my house. I give the Garrettsville Police Department permission to enter my house." The statement was witnessed by Patrolman Lance J. Gorby ("Patrolman Gorby") of the Garrettsville Police Department.
 {¶ 4} Patrolman Eric A. Dunn ("Patrolman Dunn"), also of the Garrettsville Police Department, indicated that he explained the Brady Act to Mrs. Scarl and told her that, because the incident involved domestic violence, he had a duty to seize any weapons and remove them from the house. When asked, Mrs. Scarl indicated that there were weapons in the house, but she did not know exactly where they were located. At the suppression hearing, Patrolman Gorby testified that Mrs. Scarl wanted the weapons removed and wished to press charges against appellant.
 {¶ 5} Patrolman Gorby also testified that Mrs. Scarl provided the officers with oral consent to search her home for weapons. He testified at the suppression hearing as follows:
 {¶ 6} "A: * * * [Mrs. Scarl] stated she knew he had a couple shotguns and some other weapons, that she did not know what they were and she didn't know where they were located.
 {¶ 7} "Q: At that time, what did she do?
 {¶ 8} "A: At that time I asked her, you know, once we were going to go to the residence and place him under arrest, I asked her if we could enter the residence and search for the weapons.
 {¶ 9} "Q: What did she say?
 {¶ 10} "A: She stated yes. * * *"
 {¶ 11} Patrolman Gorby admitted that the department's standard "Consent to Search" form was not used.
 {¶ 12} Patrolman Dunn, Patrolman Gorby, and two other officers from the same police department surrounded the house. Patrolman Gorby made contact with appellant and informed him that he was under arrest for domestic violence. Although appellant was agitated and indicated that the police did not have permission to enter the home, appellant was taken into custody without incident.
 {¶ 13} Patrolman Dunn accompanied Patrolman Gorby back to the police station with appellant, and Patrolman Dunn then proceeded to take Mrs. Scarl back to the residence. Once there, Mrs. Scarl obtained some clothing. Patrolman Dunn testified at the suppression hearing that Mrs. Scarl advised him as to which rooms the weapons might be in, and she then accompanied him throughout the house as he searched for the weapons. Patrolman Dunn testified at the suppression hearing that five weapons were recovered from a room in the basement.[1]
 {¶ 14} According to Patrolman Dunn, the door to the room was unlocked, and the door opened when he turned the doorknob. Mrs. Scarl testified at the hearing that the room was locked, she had the key to the room, and Patrolman Dunn damaged the door to get into the room. No evidence was admitted verifying this.
 {¶ 15} From this room, Patrolman Dunn recovered a .410 gauge Worthington shotgun; an Excelsior .12 gauge shotgun; a Federal Arms .308 caliber semi-automatic weapon; a Mack .90 caliber semi-automatic weapon; and an Imbel .308 caliber semiautomatic weapon with a tripod. Patrolman Dunn testified that the weapons appeared as one large and very obvious lump underneath the mattress on a bed. Under the bed was a large quantity of ammunition.
 {¶ 16} Back at the station, the officers obtained appellant's criminal history. Appellant had a vast history of criminal convictions, including contempt, disorderly conduct, disregard of safety, driving without a license, menacing, reckless operation of a vehicle, and domestic violence. One charge of telephone harassment was amended to disorderly conduct, and a resisting arrest charge had been pending. Moreover, appellant was convicted in September 1988 for aggravated assault, a fourth degree felony, in violation of R.C. 2903.12(A)(1) and (B), with a specification of physical harm to the victim, in violation of R.C. 2941.143
and 2929.11(B). For this offense, appellant was sentenced to five years of imprisonment, and he had served his sentence.
 {¶ 17} R.C. 2923.13 prohibits a person from having weapons while under a disability. According to R.C. 2923.13:
 {¶ 18} "(A) Unless relieved from disability * * *, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
 {¶ 19} "* * *
 {¶ 20} "(2) The person is under indictment for or has been convicted of any felony offense of violence * * *."
 {¶ 21} The definition of a felony offense of violence includes a violation of R.C. 2903.12, for aggravated assault. R.C. 2901.01(A)(9)(a).
 {¶ 22} The record is unclear, but it appears as if appellant was arrested on September 14, 2001 for the instant offense. It also appears as if appellant was released on his own recognizance pursuant to R.C.2937.29 and related statutes.
 {¶ 23} On June 17, 2002, the Portage County Grand Jury indicted appellant for having a weapon while under disability. It appears as if appellant's bond was continued.
 {¶ 24} Appellant was arraigned on September 16, 2002. Appellant appeared and entered a plea of not guilty to the charge contained within the indictment, and the trial court accepted appellant's plea. Appellant's bond was continued.
 {¶ 25} That same day, appellant moved the trial court to suppress evidence seized during the search of his home. The trial court held a suppression hearing on January 23, 2003. At the hearing, the trial court heard testimony from various witnesses, including Patrolman Gorby, Patrolman Dunn, and Mrs. Scarl. Relevant portions of the testimony of Patrolmen Gorby and Dunn were outlined above, and we will now highlight Mrs. Scarl's testimony.
 {¶ 26} At the hearing, Mrs. Scarl affirmatively denied stating that she wanted to press charges against appellant, but, at the same time, she testified, "I just wanted them to take my husband away." Mrs. Scarl also denied ever giving consent for the officers to search her home for weapons. Mrs. Scarl also denied and/or vehemently contradicted portions of her written statement to the police, specifically that appellant was chasing her in the car and that appellant had stated to her that there would be a "shoot-out" if the police ever came to the home.
 {¶ 27} Also, Mrs. Scarl testified at the suppression hearing that the weapons belonged to her, and appellant did not know about them. According to Mrs. Scarl, one semi-automatic weapon was purchased at a flea market, the remaining semi-automatic weapons were purchased from a friend of a friend, and the two rifles were a gift from Adino. She indicated that she made the purchase at the flea market with the intent to re-sell the weapon for a profit. The state attempted to impeach her credibility as to this matter, as Mrs. Scarl did not know what kind of weapon she had purchased. Mrs. Scarl also indicated that she kept these weapons in Adino's room in the basement in order to keep them away from her two children; as such, Mrs. Scarl indicated that she did know the location of the weapons.
 {¶ 28} Near the close of the hearing, the trial court stated, "[w]ell, the question before this Court really is to start out as to whether or not on that particular evening this lady gave consent to go in that house to get those guns.
 {¶ 29} "And this Court is of the opinion that she did, it's obvious from those documents. And of course the testimony here was that she took them around the house and showed them where it is.
 {¶ 30} "I think there is sufficient consent to go in there and get those guns.
 {¶ 31} "* * *
 {¶ 32} "Now what she says today, I wouldn't believe that woman if she told me what her name was.
 {¶ 33} "She's up there lying and perpetrating fraud on this Court and I don't appreciate that.
 {¶ 34} "She is not credible at all."
 {¶ 35} As such, the trial court overruled appellant's motion to suppress.
 {¶ 36} The matter proceeded to a two-day jury trial, commencing on September 3, 2003. Much of the testimony given at trial is duplicative of the testimony provided at the suppression hearing, but we will review some additions and notable differences.
 {¶ 37} First, Patrolman Gorby testified at trial that Mrs. Scarl told him that "she knew that [appellant] had guns in the house." Further, Sergeant Anthony Milicia ("Sergeant Milicia"), also of the Garrettsville Police Department, testified that, on the night of the incident, he examined the weapons and informed appellant that they were seized from his home. Although testimony by Mrs. Scarl and evidence admitted at thehearing indicated the weapons belonged to Mrs. Scarl, Sergeant Milicia testified at trial that appellant himself indicated to the officers that the weapons actually belonged to Adino. Sergeant Milicia indicated that, once appellant was informed that the weapons were found in his home, appellant indicated that he had in fact known the weapons were in his home. Sergeant Milicia also testified that the weapons were test-fired and operable.
 {¶ 38} We will also highlight some of the testimony provided at trial by Mrs. Scarl. At trial, she testified that both the door to the basement and the door into the apartment from the basement were locked on the night in question. According to Mrs. Scarl, Patrolman Dunn broke through the lock to get to the room when he seized the weapons. No such evidence was presented verifying this, and this was contradicted by testimony from Patrolman Dunn at trial. Further, unlike at the suppression hearing, at trial, Mrs. Scarl did not indicate who had a key to the door to the basement or to the room in the basement.
 {¶ 39} At trial, Mrs. Scarl continuously stated, "I would like to use my Fifth Amendment Right not to incriminate myself." The trial court continually ordered Mrs. Scarl to answer the state's questions. The state attempted to impeach Mrs. Scarl's credibility by demonstrating that the testimony she provided at appellant's trial on the domestic violence charge conflicted with the testimony she provided to the grand jury in the instant matter.[2] In response to this, Mrs. Scarl testified as follows:
 {¶ 40} "Q: So you are saying if you answered questions in those hearings you might have made up some answers?
 {¶ 41} "A: In the trial [for the domestic violence charge]?
 {¶ 42} "Q: Yes. Earlier trial, did you make up things?
 {¶ 43} "A: No, I simply said I didn't remember. * * *
 {¶ 44} "Q: So as sort of a crutch, you would say `I don't remember;' is that correct?
 {¶ 45} "A: Yes. * * *
 {¶ 46} "Q: Okay. So basically, if you want to, you know how to make up facts, correct?
 {¶ 47} "A: To protect myself."
 {¶ 48} The state also attempted to impeach Mrs. Scarl's credibility by demonstrating that the testimony she provided in the domestic violence trial conflicted with her testimony at the suppression hearing, in the instant matter. At trial, Mrs. Scarl admitted that, at the domestic violence trial, she indicated that she did not remember providing a written statement to the police on the night of the incident, and she denied parts of that statement. However, at trial, Mrs. Scarl also admitted at the suppression hearing that, she recalled giving such a statement.
 {¶ 49} When the state attempted to impeach her credibility at trial, she testified upon cross-examination as follows:
 {¶ 50} "Q: How much of this is a lie, the Motion to Suppress, the [suppression] hearing that we had back on January 23 and you testified * * * ? This is a lie too, for the most part?
 {¶ 51} "A: No.
 {¶ 52} "* * *
 {¶ 53} "Q: Are parts of it true and parts of it aren't true?
 {¶ 54} "A: Yes."
 {¶ 55} At trial, Mrs. Scarl also indicated that, after Adino's death, she contacted his family to obtain his personal belongings. According to Mrs. Scarl, Adino's family had recovered some, but not all, of his belongings. Further, Mrs. Scarl testified that, when Adino was alive, he had kept the weapons in a gun cabinet in the room in the basement. However, as Patrolman Dunn testified at trial, on the night of the incident, the weapons appeared as one large and very obvious lump underneath the mattress on a bed.
 {¶ 56} Importantly, Mrs. Scarl also testified that, by revealing to the police that there were weapons in the home, she breached a trust between herself and appellant. As a result, the couple had additional marital problems following the incident.
 {¶ 57} In the instant matter, the jury returned a verdict of guilty, and the trial court referred the matter to the Adult Probation Department for a presentence investigation report. At an October 27, 2003 hearing, the trial court sentenced appellant to a term of nine months of imprisonment, with a credit of fifty-eight days for time already served. The trial court confirmed the jury's verdict and memorialized appellant's sentence in the October 30, 2003 judgment entry.
 {¶ 58} From that judgment, appellant appealed on November 14, 2003. Appellant sets forth the following assignments of error for our review:
 {¶ 59} "[1.] The trial court erred in failing to grant the Defendant's motion to suppress in violation of Defendant's constitutional rights.
 {¶ 60} "[2.] The evidence does not support the verdict that the Defendant was guilty of having a weapon under disability."
 {¶ 61} In appellant's first assignment of error, he argues that the trial court erred by overruling his motion to suppress certain evidence. An appellate court's standard of review with respect to a motion to suppress is de novo. State v. Foster, 11th Dist. No. 2003-L-039, 2004-Ohio-1438, at ¶ 6, citing State v. Curry (1994), 95 Ohio App.3d 93,96. A reviewing court may not disturb a trial court's decision on a motion to suppress where it is supported by competent, credible evidence. State v. Retherford (1994), 93 Ohio App.3d 586, 592. As such, "the weight of the evidence and credibility of witnesses at [a] suppression hearing are issues primarily in the domain of the trier of fact." State v. Tibbetts (2001), 92 Ohio St.3d 146, 153, citing State v.DePew (1988), 38 Ohio St.3d 275, 277. See, also, State v. Jones (2000),90 Ohio St.3d 403, 413.
 {¶ 62} The Fourth Amendment to the United States Constitution generally prohibits a warrantless entry of a person's home, whether to make an arrest or to search for specific objects. State v. Benton
(1998), 82 Ohio St.3d 316, 318; Illinois v. Rodriguez (1990), 497 U.S. 177,181. This court has recognized that "the established rule [is] that it is unconstitutional for the police to make a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest, absent exigent circumstances." State v. Sbarra (Apr. 10, 1992), 11th Dist. No. 91-P-2341, 1992 Ohio App. LEXIS 1914, at 4-5, citing Payton v.New York (1980), 445 U.S. 573. The prohibition does not apply to situations in which voluntary consent has been obtained from a third party who possesses common authority over the premises. Tibbetts at 166, citing Rodriguez at 181. "Common authority is not to be implied from a mere property interest that a third party has in the property, but from `mutual use * * * by persons generally having joint access or control for most purposes.'" State v. McCartney, 12th Dist. No. CA2003-09-023, 2004-Ohio-4781, at ¶ 13, quoting United States v. Matlock (1974),415 U.S. 164, 172.
 {¶ 63} Consent to enter is determined under an objective standard; that is, whether the facts known to the officer would lead a reasonable man to believe that the consenting party has authority over the premises. Terry v. Ohio (1968), 392 U.S. 1, 21-22; Rodriguez at 181. Voluntariness is a question of fact to be determined from the totality of the circumstances. Schneckloth v. Bustamonte (1973), 412 U.S. 218, 248. The existence of a knowing and voluntary consent is a finding of fact, and only where that finding is clearly erroneous may a reviewing court set it aside. State v. Daniel (Dec. 31, 1990), 11th Dist. No. 89-T-4294, 1990 Ohio App. LEXIS 5877.
 {¶ 64} The issue of witness credibility was of paramount importance to the trial court's determination that Mrs. Scarl provided consent for the officers to search the house. Competent, credible evidence indicated that Mrs. Scarl provided such consent. Patrolman Dunn testified that Mrs. Scarl provided oral consent. Patrolman Gorby testified that Mrs. Scarl wanted the weapons removed. Despite this, Mrs. Scarl testified, at the suppression hearing, that she did not consent to her home being searched for weapons. After hearing all testimony, at the hearing, the trial court stated: "[n]ow what she says today, I wouldn't believe that woman if she told me what her name was. * * * She is not credible at all." As such, the trial court overruled appellant's motion.
 {¶ 65} We must follow Tibbetts and defer to the trial court's determinations of witness credibility. Because competent, credible evidence supported the trial court's decision, we cannot conclude the trial court erred by denying appellant's motion. Appellant's first assignment of error is without merit.
 {¶ 66} In appellant's second assignment of error, appellant challenges the legal sufficiency of the evidence to support a conviction for having a weapon while under a disability. "`In order to preserve the right to appeal the sufficiency of evidence upon which a conviction is based, a defendant must timely file a Crim.R. 29 motion for acquittal with the trial court.' * * * Thus, `if a Crim.R. 29 motion is not made by a defendant, he or she waives any sufficiency of evidence argument on appeal.'" State v. Barksdale (June 22, 2001), 11th Dist. No. 2000-L-088, 2001 Ohio App. LEXIS 2808, at 3, quoting State v. Perry (Aug. 29, 1997), 11th Dist. No. 94-T-5165, 1997 Ohio App. LEXIS 3884, at 10. See, also,State v. Roe (1989), 41 Ohio St.3d 18.
 {¶ 67} In the case at bar, appellant made a Crim.R. 29 motion for acquittal at the close of the state's case-in-chief. However, appellant failed to renew this motion at the close of his own case-in-chief or at the close of the state's rebuttal evidence. Therefore, pursuant toPerry, appellant has waived this argument for the purposes of appeal. See, e.g., State v. Kaseda, 11th Dist. No. 2002-L-0002, 2004-Ohio-1074, at ¶ 32; State v. Entze, 11th Dist. No. 2003-P-0018, 2004-Ohio-5321, at ¶ 25.
 {¶ 68} The merits of appellant's second assignment of error also reveal that it is without merit. "`Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while `manifest weight' challenges the believability of the evidence presented." State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at 13.
 {¶ 69} "`* * * The test [for sufficiency of the evidence] is whether after viewing the probative evidence and the inferences drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiryabout due process. It raises a question of law, the resolution of whichdoes not allow the court to weigh the evidence.'" (Parallel citations omitted and emphasis added.) Id. at 13.
 {¶ 70} "[A] reviewing court must look to the evidence presented * * * to assess whether the state offered evidence on each statutory element of the offense, so that a rational trier of fact may infer that the offense was committed beyond a reasonable doubt." State v. March (July 16, 1999), 11th Dist. No. 98-L-065, 1999 Ohio App. LEXIS 3333, at 8. The evidence is to be viewed in a light most favorable to the prosecution when conducting this inquiry. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Further, the verdict will not be disturbed on appeal unless the reviewing court finds that reasonable minds could not have arrived at the conclusion reached by the trier of fact. Statev. Dennis (1997), 79 Ohio St.3d 421, 430.
 {¶ 71} Appellant was convicted of having a weapon while under a disability, in violation of R.C. 2923.13. R.C. 2923.13 provides that no person who has been convicted of a felony offense of violence "shall knowingly acquire, have, carry or use any firearm or dangerous ordnance" unless the person has been relieved from disability pursuant to R.C.2923.14. (Emphasis added.) Appellant's prior conviction for aggravated assault was an offense of violence pursuant to R.C. 2901.01(A)(9)(a).
 {¶ 72} A person can either actually or constructively possess a firearm to satisfy the element of "having" in the offense. State v.Messer (1995), 107 Ohio App.3d 51; State v. Hardy (1978),60 Ohio App.2d 325, 327. Actual possession requires ownership and/or physical control. Hardy at 327. Actual possession may be inferred when a defendant has exercised dominion and control over the area which the weapon is found. State v. Williams (Sept. 30, 1997), 10th Dist. No. 97APA02-255, 1997 Ohio App. LEXIS 4467; State v. Pitts, 4th Dist. No. 99 CA 2675, 2000-Ohio-1986. The defendant need not have the object in his immediate physical possession. Messer at 56. See, also, State v. Walsson
(May 1, 1996), 12th Dist. No. CA95-09-063, 1996 Ohio App. LEXIS 1812, at 16, (holding that actual possession existed when a defendant leased an apartment in which a gun was found in a bedroom that also contained objects belonging to the defendant).
 {¶ 73} This court has held that constructive possession can be established by the fact that a defendant had access to a weapon and had the ability to control its use. State v. Thomas (Oct. 11, 1996), 11th Dist. No. 95-T-5253, 1996 Ohio App. LEXIS 4545; Williams. See, also,State v. Wolery (1976), 46 Ohio St.2d 316, (holding that physical possession or ownership of the weapon is not necessary, and mere access to a weapon can establish guilt). Constructive possession and access in particular, may be achieved by means of an agent. State v. Evans, 10th Dist. No. 01AP-1112, 2002-Ohio-3322. Further, multiple individuals may simultaneously constructively possess a particular weapon. Pitts at 28.
 {¶ 74} Importantly, circumstantial evidence can be used to support a finding of constructive possession. State v. Grundy (Dec. 9, 1998), 9th Dist. No. 19016, 1998 Ohio App. LEXIS 5860, at 28. For example, in Statev. Johnson, 12th Dist. No. CA88-02-002, 1989 Ohio App. LEXIS 268, at 17-18, the appellate court held that when a defendant occupies a house where weapons are found, a reasonable jury could find that he constructively possessed a weapon located in the house.
 {¶ 75} In finding appellant guilty of having a weapon while under a disability, a jury is also required to find that the state proved, beyond a reasonable doubt, that he "knowingly" had a weapon. R.C. 2901.22(B) provides that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 76} At the trial in the instant matter, the state presented evidence that the weapons were located in a room in the basement of a home occupied by Mrs. Scarl and appellant.[3] Mrs. Scarl testified at trial that, when Adino was alive, the weapons were kept in a gun cabinet in that room. After Adino passed away, the Scarls ensured the return of Adino's belongings to his family. This demonstrates that the Scarls had reestablished control of the room. The weapons, allegedly belonging to Mrs. Scarl, remained in the room, but they were apparently moved to the location under the mattress where they were later discovered by Patrolman Dunn.
 {¶ 77} Further, testimony by Patrolman Dunn indicated that, despite Mrs. Scarl's contrary statements, the doors to the basement and to that room were not locked when the evidence was seized. No testimony was presented at trial as to whether appellant had a key to the basement door or the door to Adino's room. However, after Adino's death, it can be presumed that Mrs. Scarl and appellant each had rightful access to the entire home, including that room and its belongings. Following this logic, a rational trier of fact could have found that appellant had access to the weapons at issue.
 {¶ 78} Further, assuming arguendo that only Mrs. Scarl, and not appellant, had physical access to the room in the basement, and that Mrs. Scarl herself placed the weapons under the mattress, a reasonable jury could still conclude that appellant had access to the weapons. Pursuant to Evans, constructive possession, and access in particular, can be established through an agent. As a married couple who presumably had joint control of the entire home, Mrs. Scarl acted as appellant's agent. As such, assuming arguendo that the door to the room was locked and only Mrs. Scarl had a key, a rational trier of fact could find that appellant had access to the room through his wife as his agent.
 {¶ 79} Any rational trier of fact could also have found that appellant had the ability to use the weapons. In Mrs. Scarl's written statement to the police, she stated, "[p]reviously on a different occasion [appellant] has made the comment that there would be an `all out shoot out' if the police ever came to my house." From this statement, a reasonable jury could have inferred that appellant knew how to operate the weapons. As such, in viewing the evidence in a light most favorable to the prosecution, a reasonable jury could have found that appellant had access to the weapons, had the ability to control their use, and therefore constructively possessed the weapons.
 {¶ 80} We now turn to whether the state presented sufficient evidence that appellant "knowingly" possessed these weapons. At trial, the state presented the testimony of Sergeant Milicia. Sergeant Milicia testified that appellant initially denied that any weapons were in his home. However, after Sergeant Milicia informed appellant that five weapons were seized from his home, appellant indicated that they belonged to Adino. Further, Mrs. Scarl's own written statement to police indicated that appellant had stated that there would be a "shoot-out" if the police appeared at his home.
 {¶ 81} Most notably, Mrs. Scarl testified at trial that, by revealing to the police that there were weapons in the home, she breached the trust between herself and appellant. She indicated that this caused additional marital difficulties. This statement serves as an implicit admission on behalf of Mrs. Scarl that appellant knew these weapons were in his home. Construing this evidence in a light most favorable to the state, a reasonable jury could conclude that appellant "knowingly" possessed the weapons in his home.
 {¶ 82} In summary, construing the evidence in a light most favorable to the state, a reasonable jury could have found that appellant knowingly and constructively possessed the weapons in question. Appellant's second assignment of error is without merit.
 {¶ 83} To conclude, by failing to renew his Crim.R. 29 motion for acquittal at the close of his own case-in-chief or at the close of the state's rebuttal evidence, appellant waived this argument for purposes of appeal. The merits of appellant's second assignment of error also reveal that it is not well-taken.
 {¶ 84} Appellant's assignments of error being without merit, the judgment of the Portage County Court of Common Pleas is affirmed.
Ford, P.J., Rice, J., concur.
[1] According to testimony provided by Mrs. Scarl, John Adino ("Adino") had boarded with the Scarls and occupied this room. Adino had owned a bar in Windham, Ohio and was a friend of the Scarls. Mrs. Scarl testified that Adino passed away in approximately July 2001, two months before the incident in the instant matter. Patrolman Gorby testified at the suppression hearing that he knew Adino because he went to school with Adino's daughter. According to Patrolman Gorby, Adino passed away "a long period of time" before the incident at issue in this matter.
[2] Appellant was ultimately convicted of domestic violence.
[3] No evidence was admitted demonstrating in whose name the home was actually titled. The parties do not dispute that the Scarls had possession of the entire home prior to their boarding Adino and/or leasing the room in the basement to him.