[Cite as *State v. Johnson*, 2025-Ohio-890.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NOS. 2024-L-053<br>2024-L-054 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeals from the<br>Court of Common Pleas |
| KINDREIL D. JOHNSON, | |
| Defendant-Appellant. | Trial Court Nos. 2022 CR 001311<br>2023 CR 001269 |

**O P I N I O N**

Decided: March 17, 2025
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Kristi L. Winner*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Eric M. Levy*, 55 Public Square, Suite 1600, Cleveland, OH 44113 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1} Appellant, Kindreil D. Johnson, appeals the trial court's judgment in Case No. 2023 CR 001269 ("the 2023 case"), imposing sentence after a jury found him guilty of three felony counts. Johnson also appeals the trial court's judgment in Case No. 2022 CR 001311 ("the 2022 case"), revoking his community control and imposing prison sentences after he pleaded guilty and no contest, respectively, to violating two rules of community control. We affirm.

**{¶2}** In the 2022 case, Johnson was charged with multiple offenses. Johnson ultimately pleaded guilty to the following charges: attempted having weapons under disability, a fourth-degree felony, in violation of R.C. 2923.02 and 2923.13(A)(3); aggravated possession of drugs, a fifth-degree felony, in violation of R.C. 2925.11; and aggravated possession of drugs, a fifth-degree felony, in violation of R.C. 2925.11. On February 28, 2023, the trial court sentenced Johnson to two years of community control on each count.

**{¶3}** On November 16, 2023, Jonathan Mehm, a patrol officer for the City of Willoughby Police Department, initiated a traffic stop on Johnson as a result of a turn-signal violation. Nicholas Merrifield, a canine officer for the City of Wickliffe Police Department, arrived at the stop and conducted a canine sniff of Johnson's vehicle. After the canine alerted, the officers searched the vehicle, wherein they located a loaded firearm and three digital scales speckled with a white residue, later confirmed to be cocaine.

**{¶4}** As a result of the stop, an indictment was filed in the 2023 case, charging the following four felony counts: (1) having a weapon while under disability, in violation of R.C. 2923.13(A)(2), a third-degree felony; (2) having a weapon while under disability, in violation of R.C. 2923.13(A)(3), a third-degree felony; (3) improperly handling firearms in a motor vehicle, in violation of R.C. 2923.16(B), a fourth-degree felony; and (4) possession of cocaine, in violation of R.C. 2925.11, a fifth-degree felony.[1] Due to these charges, the State moved to terminate Johnson's community control in the 2022 case.

---

1. The indictment further charged two misdemeanor counts, which were ultimately dismissed on the State's motion.

Case Nos. 2024-L-053 and 2024-L-054

**{¶5}** Johnson pleaded not guilty in the 2023 case and moved to suppress the evidence obtained from the traffic stop. Following a hearing, the trial court denied the motion, and the case proceeded to jury trial. The jury found Johnson guilty on all four felony counts.

**{¶6}** Thereafter, based on the jury's verdict in the 2023 case, Johnson appeared before the court relative to the 2022 case, and he pleaded guilty and no contest, respectively, to violating the following rules of community control: (1) that Johnson obey all local, state, and federal laws, and (2) that Johnson not purchase, own, possess, or have under his control any firearm. Thereafter, the trial court terminated community control. The court then proceeded to sentencing in both cases.

**{¶7}** In the 2023 case, the trial court merged the first two counts, charging Johnson with having a weapon while under disability, and the State elected to proceed to sentencing on the first count. The trial court imposed prison sentences of 24 months on the first count, 12 months on the third count (improperly handling firearms in a motor vehicle), and 11 months on the fourth count (possession of cocaine), all to be served concurrently.

**{¶8}** In the 2022 case, the trial court imposed prison sentences of 12 months on the first count (attempted having weapons under disability), 11 months on the second count (aggravated possession of drugs), and 11 months on the third count (aggravated possession of drugs). The trial court ordered that the sentences be served concurrently with each other, but consecutively to the sentences imposed in the 2023 case.

**{¶9}** Johnson noticed appeals from both cases. On his motion, this court consolidated the appeals. Johnson assigns three errors for our review.

3

Case Nos. 2024-L-053 and 2024-L-054

{¶10} In his first assigned error, Johnson argues:

{¶11} "The trial court erred when it denied Johnson's motion to suppress evidence after hearing."

{¶12} "The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures." *State v. Croff*, 2017-Ohio-8629, ¶ 22 (11th Dist.), citing *Terry v. Ohio*, 392 U.S. 1 (1968); *State v. Polk*, 2017-Ohio-2735, ¶ 12. "A traffic stop by law enforcement is a seizure that must comply with the Fourth Amendment's reasonableness requirement." (Citation omitted.) *Croff* at ¶ 24. "[E]vidence obtained through unlawful searches and seizures is inadmissible" and thus appropriately suppressed prior to trial. *State v. Young*, 146 Ohio App.3d 245, 257, 2001-Ohio-4284 (11th Dist.), citing *United States v. Leon*, 468 U.S. 897, 916 (1984); and *Mapp v. Ohio*, 367 U.S. 643 (1961).

{¶13} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366. Therefore, we accept the trial court's findings of fact that are supported by competent, credible evidence. *Burnside* at ¶ 8. We then review, de novo, whether those facts satisfy the applicable legal standards. *Id.*; *State v. Eggleston*, 2015-Ohio-958, ¶ 18 (11th Dist.).

{¶14} Here, at the suppression hearing, Officer Mehm testified that, on November 16, 2023, while on patrol at about 2:00 p.m., he observed an unfamiliar vehicle at a residence known for drug activity. As the officer slowly drove by, he ran the vehicle's

4

license plate number through LEADS on his mobile computer. From this, he learned that Johnson was the registered owner of the vehicle. Thereafter, the officer parked his cruiser a short distance away and entered Johnson's information into OHLEG. From this, the officer learned that Johnson had been arrested by the Solon Police Department, which alleged to have recovered narcotics and a firearm from Johnson's vehicle. Johnson had been indicted on those charges, and the case was pending. Further investigating Johnson's background, the officer searched the Cuyahoga County Clerk of Courts docket and learned that Johnson had also been indicted for felonious assault in another pending case.

{¶15} While the officer was parked, Johnson drove past the officer. The officer then followed Johnson, with a few vehicles between them, as Johnson drove in the outer of two lanes of southbound traffic. The officer then observed the vehicle abruptly change from the outer southbound lane to the inner southbound lane without the use of a turn signal, nearly cutting off another motorist traveling in the inner southbound lane. The officer then caught up to the vehicle, and he noticed that there was at least one additional passenger in the vehicle. The officer did not immediately initiate a traffic stop for the turn-signal violation because he was aware from his department's GPS that other officers were not located nearby to provide backup. The officer initiated the stop a brief time later by activating his overhead lights, which in turn initiated a recording by the dash camera and a microphone on the officer's person.

{¶16} The vehicle pulled over and stopped at approximately 2:13 p.m. At the hearing, Officer Mehm identified the recording of the stop, which was played for the court. The officer explained that the turn signal violation was not recorded because it occurred

5

more than sixty seconds prior to activation of the overhead lights, which is when the video commenced.

{¶17} The officer called in the stop to his department, and his captain advised that he would respond to the stop as well. The officer approached the vehicle from the passenger side, at which point he observed a male driver, a male front seat passenger, and a male back seat passenger. The officer "noticed that the driver had the keys of the vehicle which was just the single car key in a like fob I guess to lock unlock, out of the ignition and his right hand. Which to [the officer] was very unusual." The officer testified that, typically, a driver will not remove the keys from the ignition during a stop.

{¶18} After approaching the vehicle, the officer explained to the driver the basis for the stop and asked the driver for his license. Johnson stated he did not have his identification on him, and the officer asked for his name, Social Security number, and birth date, which Johnson provided. The officer also requested identification from the passengers, who declined to provide it.

{¶19} The officer then returned to his cruiser to begin a digital citation for the turn-signal violation. He also contacted dispatch to request a canine unit from a neighboring agency to respond to the scene. Further, the officer requested a sergeant to come to the stop as backup. The officer explained that, although his captain was en route to the stop, the department's practice, for officer safety, is to attempt to have present at least as many officers at a stop as there are occupants of the vehicle.

{¶20} Thereafter, the officer returned to Johnson's vehicle to obtain Johnson's current address and telephone number, which Johnson provided. While at Johnson's vehicle, the officer also asked if there was anything illegal or any firearms in the vehicle,

6

which is customary practice for officer safety. At that point, either Johnson and/or the passengers replied in the negative. Johnson then immediately stated, unprompted, that he did not consent to a search of the vehicle.

{¶21} The officer returned to his cruiser to continue entering information for the citation, and he realized he had not requested proof of insurance. The officer approached Johnson's vehicle a third time and asked for proof of insurance. Johnson indicated that he did not have proof of insurance on him or on his phone.

{¶22} The officer then returned to his cruiser. Soon thereafter, the officer's captain arrived, and the officer informed him of the nature of the stop, of where he had first seen the vehicle, and of Johnson's pending cases. The officer then informed the captain that the two passengers would not identify themselves. Thereafter, the officer stated to the captain, "I mean they don't have to, but they declined when I asked. So let's just wait for the dog and go from there. Just writing out his citations." The officer testified that providing background information to backup officers is also typical practice during a traffic stop.

{¶23} As Officer Mehm was speaking to the captain, approximately thirteen minutes into the stop, and prior to the completion of the citation, the canine officer, Officer Merrifield, arrived. Officer Merrifield informed Officer Mehm that he should remove the occupants from the vehicle for the sniff. At that point, Officer Mehm removed the front seat passenger, who was resistant to exit Johnson's vehicle and to submit to a pat-down search. After removing the front seat passenger from the vehicle, the officer placed him in the backseat of his cruiser. Officer Mehm then proceeded to remove the backseat passenger and Johnson, who then waited outside Johnson's vehicle with officers.

7

**{¶24}** During the sniff, the canine alerted to the presence of narcotics. Officers Mehm and Merrifield then began a search of the vehicle, and they observed that the glove box was locked. Johnson declined to provide the key. In the rear of the vehicle, on the back pocket of the front passenger seat, officers located a digital scale with a white, powdery residue, suspected to be cocaine. Johnson was then placed under arrest. Officers conducted a search incident to arrest and retrieved the car key and fob from Johnson, which they used to unlock the glovebox. Within the glovebox, officers located a firearm and two additional digital scales with white, powdery residue on them.

**{¶25}** On cross-examination of Officer Mehm, the officer confirmed that he had obtained information on Johnson prior to stopping him, including his name, possible address, birth date, and Social Security number, and that Johnson had a valid license and no warrants. The officer confirmed that ideally the number of officers at the stop will match the number of occupants in the vehicle, although it is not always possible, and he was aware that more than one person was in Johnson's vehicle when he approached it alone. Further, the officer affirmed that, when he initially approached the vehicle, the driver appeared to be Johnson from the information the officer had obtained prior to the stop; however, he elicited identifying information from the driver himself to confirm that the driver was Johnson and to complete the citation.

**{¶26}** The officer further indicated that, when he returned to Johnson's vehicle the second time to obtain Johnson's address and telephone number, he "frankly just forgot" to ask Johnson if he had insurance. After approaching the vehicle the third time and asking Johnson about insurance, the officer affirmed he had all the information he needed to process the citation. At that time, it was 2:24 p.m.

8

Case Nos. 2024-L-053 and 2024-L-054

**{¶27}** At 2:25 p.m., Captain Smith arrived and spoke to Officer Mehm. Officer Mehm confirmed that he stated to the captain that he wanted to "wait" for the canine. Officer Merrifield arrived with the canine at approximately 2:26 p.m. Officer Mehm testified that he then removed the occupants from Johnson's vehicle, and the canine sniff occurred at 2:31 p.m., which was slightly more than seven minutes after the officer had completed obtaining all the information from Johnson that was required to complete the citation. However, because Officer Mehm was removing the occupants from the vehicle, he did not work on the citation during this approximate seven-minute period.

**{¶28}** On redirect examination, Officer Mehm maintained that, for his safety, he would never remove three individuals from a vehicle on his own. Although the officer believed that additional detention to await the canine would have been justified based on the particular aspects of this stop, it was unnecessary to prolong the stop because Officer Merrifield arrived during the regular course of the stop for the traffic infraction.

**{¶29}** On recross examination, the officer maintained that, although he had obtained all the information he needed from Johnson to complete the citation once he inquired regarding insurance, he had more information to enter into the system than solely marking whether Johnson had insurance. Further, the officer affirmed that he ordered the occupants out of the vehicle because of Officer Merrifield's request.

**{¶30}** After Officer Mehm's testimony and the parties' arguments, the trial court made several findings on the record, including the following:

> The Court finds that there wasn't a -- the traffic stop wasn't prolonged. It wasn't delayed. The evidence shows that the officer the entire time was clearly working on the citation. The total amount of time was thirteen minutes which is not excessively long. It's not long at all, regardless of being excessively long.

9

There's no evidence he was taking his time in preparing this citation. He went back that third time to get information. That was just a minute forty-five after he got the -- the second time he went out. If he was delaying, he could have sat there for much longer amount of time and then gone out and got that.

The Court finds this explanation that he just simply forg[o]t to ask that when he went up the second time very credible. Again, if he was trying to delay or extend this, he could have easily done it, just sat there longer. But he was clearly working the whole time on this ticket. And the whole thing only took seventeen or excuse me, thirteen minutes. So the Court finds that this stop was not prolonged at all in order to wait for the K-9 to get there to conduct this search.

And even if the officer testified that he was going to -- he was waiting for the dog to get there, that he would have waited if he had been done, the evidence doesn't establish that that's what he did. The K-9 officer with the dog was there prior to the citation being completed and again the officer did not delay in working on the citation and completing the citation in order to create more time for the officer to get there. So the Court finds there's no merit to that.

{¶31} On appeal, Johnson maintains that the officer engaged in "unnecessary busywork" to prolong the stop to await the canine unit. He further contends that removal of Johnson and his passengers from the car was unconstitutionally intrusive.

{¶32} However, despite Officer Mehm's testimony that he believed he had reasonable suspicion to extend the stop to await the canine officer, he also testified that he had not yet completed the traffic citation when Officer Merrifield arrived, and he had not delayed its completion. As set forth above, the trial court found this testimony credible. Because there is competent, credible evidence to support the trial court's determination that Officer Mehm did not delay the stop past the time necessary to complete the tasks related to the traffic infraction, we need not address whether Officer Mehm had reasonable suspicion to prolong the stop. Further, as Officer Mehm had not delayed the

10

Case Nos. 2024-L-053 and 2024-L-054

stop nor completed the tasks relative to the initial basis for the stop when he ordered the occupants out of Johnson's vehicle, his doing so did not constitute an impermissible detention. *See Arizona v. Johnson*, 555 U.S. 323, 324 (2009) (during a lawful stop for a traffic violation, officers may order occupants out of the vehicle).

{¶33} Accordingly, Johnson's first assigned error lacks merit.

{¶34} In his second and third assigned errors, Johnson contends:

> [2.] The trial court erred when it denied Johnson's motions for acquittal pursuant to Crim. R. 29 and otherwise when it entered convictions against Johnson on each offense absent sufficient evidence to support each charge.
>
> [3.] Appellant Johnson's convictions were all entered against the manifest weight of the evidence where the evidence weighs heavily against a conclusion that Johnson acted knowingly.

{¶35} Johnson argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

{¶36} The question of whether sufficient evidence supports a conviction "is a test of adequacy," which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52. "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Dent*, 2020-Ohio-6670, ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259, (1991), paragraph two of the syllabus.

{¶37} Unlike a review of the sufficiency of the evidence, our review of the "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence . . . to support one side of the issue rather than the other.*'" (Emphasis in original.) *Thompkins*

11

at 387, quoting *Black's Law Dictionary* (6th Ed. 1990). When considering challenges to the weight of the evidence, an appellate court reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *Martin* at 175.

**{¶38}** Thus, an appellate court's determination that a conviction is not against the weight of the evidence necessarily incorporates a conclusion that sufficient evidence supports the conviction. *State v. Fiederer*, 2020-Ohio-4953, ¶ 11 (11th Dist.).

**{¶39}** Here, as discussed in our recitation of the procedural history, Johnson was convicted of having a weapon while under disability, in violation of R.C. 2923.13(A)(2); improperly handling firearms in a motor vehicle, in violation of R.C. 2923.16(B); and possession of cocaine, in violation of R.C. 2925.11.

**{¶40}** First, regarding having a weapon while under disability, R.C. 2923.13(A)(2) provides, "Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance,

12

Case Nos. 2024-L-053 and 2024-L-054

if . . . [t]he person is under indictment for or has been convicted of any felony offense of violence . . . ." With respect to this offense, this court has explained:

> A person can either actually or constructively possess a firearm to satisfy the element of "having" in the offense. Actual possession requires ownership and/or physical control. Actual possession may be inferred when a defendant has exercised dominion and control over the area which the weapon is found. The defendant need not have the object in his immediate physical possession.
>
> This court has held that constructive possession can be established by the fact that a defendant had access to a weapon and had the ability to control its use. Constructive possession and access in particular, may be achieved by means of an agent. Further, multiple individuals may simultaneously constructively possess a particular weapon.
>
> Importantly, circumstantial evidence can be used to support a finding of constructive possession. . . .

(Internal citations omitted.) *State v. Scarl*, 2004-Ohio-7227, ¶ 72-74 (11th Dist.).

{¶41} With respect to the charge for improperly handling firearms in a motor vehicle, R.C. 2923.16(B) provides, "No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle."

{¶42} In regard to the charge for possession of cocaine, R.C. 2925.11 provides, "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog."

{¶43} For purposes of all charges at issue in the case:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense,

13

> such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B).

{¶44} Here, at trial, the court read to the jury a stipulation, which was also submitted to the jury as a joint exhibit, wherein the parties agreed that on the date at issue, Johnson was under indictment for a felony offense of violence, so as to create a disability under R.C. 2923.13(A)(2).

{¶45} Thereafter, the State presented the testimony of Officers Mehm and Merrifield and of employees of the Lake County Crime Lab.

{¶46} Officer Mehm, who had testified at the suppression hearing as discussed in our review of the first assigned error, testified at trial that he stopped Johnson for a turn-signal violation on November 16, 2023. Officer Mehm's dash camera video and synced body microphone recording were published to the jury and admitted into evidence. The officer explained that, when he first approached the passenger side of the vehicle, he noticed three occupants in the vehicle. Johnson identified himself as the driver, and the officer observed that the keys were out of the ignition, and Johnson was holding the key fob in his right hand. When the officer returned to his cruiser, he requested a canine unit and backup officers. When the officer returned to Johnson's vehicle to obtain additional information for the citation, he also asked the occupants if there were any firearms or anything illegal in the vehicle, and the occupants responded in the negative. Then, unprompted, Johnson stated that he did not consent to any searches or seizures.

14

{¶47} The officer further testified that a canine officer from a neighboring jurisdiction, Officer Merrifield, arrived at the stop. Officer Mehm removed the occupants from the vehicle for purposes of the canine sniff.

{¶48} Officer Merrifield testified that he received a request to assist the Willoughby Police Department relative to the stop at issue. Officer Merrifield activated his body camera prior to the sniff. The recording, which does not contain audio, was published to the jury and admitted into evidence. The officer maintained that the canine demonstrated alert behavior while walking around the vehicle, and, on the canine's second pass of the vehicle, it indicated at the front passenger door.

{¶49} Officers Merrifield and Mehm testified that after the canine positively indicated, they conducted a search of the vehicle. While searching, the officers discovered that the glove compartment was locked. Officer Mehm asked Johnson for the key, and he declined, despite the officer notifying him that, without the key, they would pry open the glovebox with a crowbar. Thereafter, the officers located a digital scale with a white powder residue in the back pocket of the front passenger seat. Officer Mehm placed Johnson under arrest and retrieved the key from Johnson to unlock the glove compartment. Inside the glove compartment, Officer Mehm located a Glock 47 handgun, with a round in the chamber that was ready to fire and a magazine that was fully loaded. The officer unloaded the handgun to render it safe, and he then located two additional digital scales with white powder residue in the glove compartment. The officer packaged the scales and firearm for evidence processing.

{¶50} On cross-examination of Officer Mehm, he affirmed that he did not observe, prior or during the stop, any motions in the vehicle that would indicate Johnson was

15

accessing the glove compartment or the rear passenger area. In addition, the officer did not know who had access to the vehicle or the keys prior to the stop. The officer confirmed that the front seat passenger, Delontae Brown, had also been charged after the stop in connection with the firearm in the vehicle.

**{¶51}** On redirect examination, Officer Mehm explained that both Johnson and Brown were charged in connection with the firearm because both were in the front seat with access to the firearm, but the key to the locked glove compartment was in Johnson's hand when the officer approached the vehicle.

**{¶52}** On recross examination, the officer acknowledged that Brown was later charged with drug offenses because it was discovered that he had cocaine on his person when he was arrested at the stop, and he smuggled the drugs into the police department, where he hid them under a toilet. No drugs were located on Johnson's person.

**{¶53}** Following the officers' testimony, employees of the Lake County Crime Lab testified. A DNA supervisor testified that she swabbed the firearm submitted in this case for DNA. Genetic material from at least five different individuals was present on the firearm. Because of the number of contributors, she could not reliably create a genetic profile. Thus, no comparison to any known DNA samples was conducted.

**{¶54}** A forensic analyst testified that he tested the firearm submitted in this case, and it was operable. Although not requested to test for fingerprints, the analyst testified he was certified to do so. However, he did not proceed to conduct such a test because he did not observe any fingerprints on the firearm, which is not unusual.

**{¶55}** Another forensic analyst testified that he tested the three digital scales that were submitted in this case. Swabs taken from each of the scales contained cocaine

16

residue. The analyst stated that the term "residue" indicates that the amount of the substance could not be weighed. On cross-examination, the analyst maintained that the lab cannot weigh substances less than .06 grams.

{¶56} After the above testimony, the State rested, and the defense moved for acquittal pursuant to Crim.R. 29, which the trial court overruled.

{¶57} The defense then called Delontae Brown, who, as discussed above, was the front seat passenger in Johnson's vehicle at the time of the stop. Brown asserted his rights under the Fifth Amendment outside of the presence of the jury.

{¶58} Thereafter, the defense recalled Officer Mehm, who testified that he detained Brown in his cruiser after removing Brown from Johnson's vehicle. After the scale with the residue was found in the back pocket of the front passenger seat, both Johnson and Brown were placed under arrest. Once Brown was given his *Miranda* rights, the officer had a conversation with Brown in his cruiser, which was recorded by his microphone that was synced with the dash camera video. The recording was published to the jury and entered as an exhibit.

{¶59} During the discussion between Officer Mehm and Brown, Brown repeatedly stated that the gun in Johnson's vehicle belonged to him, and he maintained that he was permitted to have a gun. The officer replied that he disagreed due to outstanding warrants for Brown's arrest. Brown further stated that the scales that were found with the gun belonged to him as well.

{¶60} On examination by the State, Officer Mehm maintained that, after Brown indicated that the scales belonged to him, the officer asked Brown why he had scales with white, powder residue on them if he was not selling drugs. At point, Brown denied

17

any knowledge of the scales. The officer further maintained that, when patting down Brown prior to his arrest, torn up baggies were found in his pocket that are consistent with a method of drug distribution.

{¶61} On further examination by the defense, the officer confirmed that Brown did not deny the firearm was his after the officer informed him that his fugitive status created a disability. However, Brown's statements indicated that he did not believe he was prevented from possessing a firearm.

{¶62} After Officer Mehm's testimony, the defense rested and renewed its Crim.R. 29 motion, which the trial court denied.

{¶63} On appeal, Johnson maintains that the evidence did not establish the culpable mental state of "knowingly" to support the convictions. However, as set forth above, law enforcement discovered the loaded firearm and two of the scales in Johnson's locked glove compartment, to which Johnson was holding the key at the time of the stop. Johnson refused to provide the key after the canine alerted, despite Officer Mehm informing him that the officers would use a crowbar to pry open the glove compartment if necessary.

{¶64} Further, although Brown informed Officer Mehm that the firearm and scales belonged to him, ownership is not dispositive of possession, and more than one individual may jointly possess an item. *See Scarl*, 2004-Ohio-7227, ¶ 72-74 (11th Dist.). Moreover, Officer Mehm testified that Brown later stated that he had no knowledge of the scales, and, in any event, the jury was not required to accept the veracity of any statement Brown made to Officer Mehm. The jury could reasonably infer from the evidence presented that Johnson knowingly possessed the firearm and the scales.

18

Case Nos. 2024-L-053 and 2024-L-054

{¶65} Johnson further argues, with respect to his conviction for improperly handling a firearm, that the evidence established that the firearm could not be accessed while it was being transported because the firearm was locked in the glove compartment, and the key to the ignition was the same key that unlocked the glove compartment. However, as set forth above, R.C. 2923.16(B) prohibits an individual from knowingly transporting or possessing a loaded firearm in a vehicle "in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle." Thus, although the loaded firearm was locked in the glove compartment, it was accessible to the occupants "without leaving the vehicle."

{¶66} Johnson next argues that R.C. 2923.16(F)(5) creates an exception to a violation of improperly handling a firearm in a motor vehicle, as it provides that division (B) of that section does not apply to an individual who holds a valid concealed handgun license, so long as that person does not knowingly possess or transport the firearm in certain locations identified in R.C. 2923.126(B). Johnson next maintains that R.C. 2923.111 extends this exception from those who hold concealed handgun licenses to any individual qualified to carry a handgun.

{¶67} However, regardless of the effect of R.C. 2923.111 on the exception contained in R.C. 2923.16(F)(5), the parties stipulated that Johnson was not permitted to possess a firearm. Although Johnson recognizes that he was not a "qualifying adult" under the statute, he argues that the State did not establish that the other occupants of the vehicle were not "qualifying adults."

{¶68} Regardless, as discussed above, there existed evidence that Johnson possessed the firearm. We are unable to discern how, if the exception to improper

19

handling of the firearm applied to the passengers of the vehicle, the exception would extend to Johnson.

**{¶69}** Next, Johnson argues that the State failed to prove that he knowingly possessed the cocaine based on the exceedingly small amount of cocaine that was located on the scales. However, the jury could reasonably infer from the circumstances of this case, including that two scales were locked in the glove compartment, that Johnson knowingly possessed the cocaine.

**{¶70}** After review, we conclude that this is not the extraordinary case where the evidence weighs heavily against the convictions. Therefore, we cannot say that the convictions are against the manifest weight of the evidence. Thus, the convictions are necessarily supported by sufficient evidence.

**{¶71}** Accordingly, Johnson's second and third assigned errors lack merit.

**{¶72}** The judgments are affirmed.

ROBERT J. PATTON, P.J.,

SCOTT LYNCH, J.,

concur.